# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **CORD LEE BENSON,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 4:16-CV-673-MHH** |
| | } | |
| **NANCY BERRYHILL,** | } | |
| **Acting Commissioner of the** | } | |
| **Social Security Administration,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), plaintiff Cord Lee Benson seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Mr. Benson's claims for a period of disability, disability insurance benefits, and supplemental security income. After careful review, the Court affirms the Commissioner's decision.[1]

## I.    PROCEDURAL HISTORY

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. (*See* https://www.ssa.gov/agency/commissioner.html). Therefore, the Court asks the Clerk to please substitute Ms. Berryhill for Carolyn W. Colvin as the defendant in this action. *See* Fed. R. Civ. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. Later opinions should be in the substituted party's name, but any misnomer not affecting the parties' substantial rights must be disregarded.").

Mr. Benson applied for a period of disability and disability insurance benefits and supplemental security income on January 23, 2012. (Doc. 7-4, pp. 2-3). Mr. Benson alleges that his disability began on June 10, 2009. (Doc. 7-6, pp. 2, 8). The Commissioner initially denied Mr. Benson's claims on May 7, 2012. (Doc. 7-5, pp. 2, 7). Mr. Benson requested a hearing before an Administrative Law Judge (ALJ). (Doc. 7-5, pp. 16-17). The ALJ issued an unfavorable decision on April 22, 2014. (Doc. 7-3, pp. 43-58). On February 25, 2016, the Appeals Council declined Mr. Benson's request for review (Doc. 7-3, p. 2), making the Commissioner's decision final and a proper candidate for this Court's judicial review. *See* 42 U.S.C. §§ 405(g) and 1383(c).

## II.    STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d

1155, 1158 (11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r of Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven that he is disabled, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past

relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Mr. Benson has not engaged in substantial gainful activity since June 15, 2009, the alleged onset date. (Doc. 7-3, p. 45).[2] The ALJ determined that Mr. Benson suffers from the following severe impairments: degenerative disc disease, degenerative joint disease with chronic low back pain/lumbago, spondylosis, sacroiliitis, osteoarthritis at multiple sites with musculoskeletal pain, arthralgias, hepatitis, coronary arterial disease, history of venous insufficiency, gout diagnosed on one occasion, episode of acute bronchitis, obesity, and depression/mood disorder. (Doc. 7-3, p. 45). Mr. Benson also has the non-severe impairment of hyperlipidemia. (Doc. 7-3, p. 46). Based on a review of the medical evidence, the ALJ concluded that Mr. Benson does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Doc. 7-3, p. 46).

---

[2] According to Mr. Benson's applications for disability benefits, June 10, 2009 is the alleged onset date. (Doc. 7-6, pp. 2, 8). This discrepancy is immaterial to the Court's analysis.

In light of Mr. Benson's impairments, the ALJ evaluated Mr. Benson's residual functional capacity. The ALJ determined that Mr. Benson has the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) and 416.967(b) except for the following limitations: the claimant can interact appropriately with supervisors but this should be casual non-confrontational and with supportive feedback; can interact appropriately with coworkers, customers, and members of the general public but this should be casual non-confrontational and infrequent; can respond appropriately to work pressures in usual work setting; can respond appropriately to changes in a routine work setting but changes should be infrequent and gradually introduced; can use judgment for simple 1-2 step work related decisions; cannot use judgment in detailed or complex work related decisions; can understand, remember, carry out simple 1-2 step instructions; cannot understand remember and carry out detailed or complex instructions; and can maintain attention, concentration and pace for at least 2 hours and concentrate and persist at tasks at an appropriate pace throughout an 8 hour day with customary work breaks. In addition, the claimant can occasionally lift and/or carry 20 pounds, and frequently up to 10 pounds. He can stand and/or walk with normal breaks for a total of 3 hours, and sit with normal breaks for a total of more than 6 hours on a sustained basis in an 8 hour workday. The claimant is limited in the bilateral lower extremities to occasional pushing and/or pulling. The claimant can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb[] ladders, ropes, or scaffolds. The claimant has no manipulative limitations, visual limitations, or communicative limitations. The claimant should avoid concentrated exposure to extreme cold. He is unlimited in exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, poor ventilation, etc. He should avoid concentrated exposure to vibration, and all exposure to hazards. He must avoid all unprotected heights and hazardous machinery. . . . In addition, out of an abundance of caution and giving the claimant the benefit of all doubt, the claimant will require a sit/stand option all day at the claimant's option.

(Doc. 7-3, pp. 48-49) (internal citation omitted).

Based on this RFC, the ALJ concluded that Mr. Benson is not able to perform his past relevant work as a sand blaster, machine packager, cook/kitchen manager, or truss builder. (Doc. 7-3, p. 56). Relying on testimony from a vocational expert, the ALJ found that jobs exist in the national economy that Mr. Benson can perform, including assembler, hand packer, and call out wire worker. (Doc. 7-3, p. 57). Accordingly, the ALJ determined that Mr. Benson has not been under a disability within the meaning of the Social Security Act. (Doc. 7-3, p. 57).

## IV.   SUMMARY OF THE MEDICAL EVIDENCE

### A.   Record Before the ALJ

#### 1.   Treatment Records

On March 9, 2006, Dr. Michael Herndon at Alexandria Medical Clinic diagnosed Mr. Benson with varicose veins and leg pain and noted that Mr. Benson was obese. (Doc. 7-9, p. 28). On September 4, 2009, Dr. Herndon diagnosed Mr. Benson with acute gouty arthritis. (Doc. 7-9, p. 24). On January 7, 2010, Mr. Benson asked Dr. Herndon to refer him to a vascular surgeon. (Doc. 7-9, p. 23). During this visit, Dr. Herndon diagnosed varicose veins on Mr. Benson's legs and noted that Mr. Benson was obese. (Doc. 7-9, p. 23).

On May 24, 2010, Mr. Benson visited the emergency room at Northeast Alabama Regional Medical Center and complained about an abscess located on his lower back. (Doc. 7-9, p. 60). Mr. Benson rated the pain a 5 out of 10. (Doc. 7-9,

p. 60). Mr. Benson had a normal range of motion in his extremities. (Doc. 7-9, p. 61). Mr. Benson returned twice over the next three days for rechecks of the abscess. (Doc. 7-9, pp. 54-59). During both of these visits, Mr. Benson's musculoskeletal exams were normal. (Doc. 7-9, pp. 55, 58).

On November 8, 2011, Mr. Benson visited Northeast Alabama Regional Medical Center after experiencing chest pain that he rated an 8 out of 10. (Doc. 7-9, p. 37). When he was admitted, Mr. Benson was not experiencing "specific discomfort," and doctors explained that he did "not appear to be in any pain" and did "not appear to be hurting" or experiencing distress. (Doc. 7-9, p. 37). Mr. Benson's cardiac examination was normal. Doctors noted that his extremities had no cyanosis or swelling. Mr. Benson moved all of his extremities "without any difficulty," and he had no erythema or swelling in his joints. (Doc. 7-9, p. 38). At discharge, Dr. Davisson Edmond diagnosed Mr. Benson with hypertension, hyperlipidemia, and chest pain. (Doc. 7-9, p. 35). Dr. Edmond noted that Mr. Benson was morbidly obese but was "ambulating very well." (Doc. 7-9, p. 35). Mr. Benson had a negative EKG and stress test, and the rest of his physical exam was unremarkable. (Doc. 7-9, p. 35).

On February 1, 2012, Mr. Benson saw nurse practitioner Janice Parker at Quality of Life Heatlh Services. Mr. Benson complained of lower back pain that radiated to his right thigh. (Doc. 7-10, p. 4). He stated that his symptoms were

aggravated by "ascending stairs, bending, changing positions, descending stairs, lifting, sitting[,] and walking." (Doc. 7-10, p. 4). Although doctors had diagnosed degenerative disc disease five or six years earlier, Mr. Benson told the nurse practitioner that he had not had back problems in years. (Doc. 7-10, p. 4). Mr. Benson had no cervical spine tenderness or thoracic spine tenderness, and he had normal mobility and curvature. (Doc. 7-10, p. 6). Mr. Benson's hips had a full range of motion, and he had no joint deformity, heat, swelling, erythema, or effusion. (Doc. 7-10, p. 6). Ms. Parker noted that Mr. Benson had a reduced range of motion due to the severity of the pain radiating down the right thigh on movement and palpitation of the lumbar spine area. (Doc. 7-10, p. 6). Ms. Parker also noted Mr. Benson's lumbar spine had severe pain with motion and spasms. (Doc. 7-10, p. 6). Ms. Parker diagnosed Mr. Benson with an acute sprain in his lumbar region and acute pain in the limb. (Doc. 7-10, p. 6). She prescribed warm compresses, topical pain cream, and prescription pain medication. (Doc. 7-10, p. 6).

On February 8, 2012, Mr. Benson saw Ms. Parker at Quality of Life again. (Doc. 7-10, p. 8). Mr. Benson complained of persistent low back pain and told Ms. Parker that his prescribed medications did not provide "much relief." (Doc. 7-10, p. 8). Mr. Benson was positive for back pain, joint pain, and muscle weakness, and his gait was limp. (Doc. 7-10, pp. 9-10). A cervical and thoracic spine

examination was normal, but Mr. Benson's lumbar spine was tender and his range of motion was moderately reduced. (Doc. 7-10, p. 10). Ms. Parker recommended an MRI of Mr. Benson's lumbar spine, and treatment notes indicate Mr. Benson was going to consider the procedure. (Doc. 7-10, p. 10).[3] Ms. Parker diagnosed chronic lumbago and chronic neuralgia, and she prescribed oral prescriptions, topical pain medication, and warm compresses. (Doc. 7-10, p. 10).

On February 15, 2012, Mr. Benson saw Dr. Carla Thomas at Quality of Life. (Doc. 7-10, p. 12). He again complained of pain in his lower back and gluteal area. (Doc. 7-10, p. 12). The pain radiated to the left and right ankle, and Mr. Benson described the pain as "burning, deep, diffuse, and shooting." (Doc. 7-10, p. 12). The pain was aggravated by bending, flexing, and sneezing. (Doc. 7-10, p. 12). Dr. Thomas noted that Mr. Benson's symptoms were "relieved by heat." (Doc. 7-10, p. 12). Dr. Thomas found that Mr. Benson's left and right hips were tender, and his lumbar spine had a muscle spasm; however, Mr. Benson's gait was normal, and he had full range of motion in his extremities and an otherwise normal musculoskeletal exam. (Doc. 7-10, p. 14). Dr. Thomas explained that Mr. Benson's neuralgia and lumbar sprain had improved, and she encouraged Mr. Benson to exercise. (Doc. 7-10, p. 14).

---

[3] The medical record does not contain evidence that Mr. Benson had the MRI procedure.

On February 23, 2012, Mr. Benson saw Dr. Jeffrey Pierson at Stringfellow Memorial Hospital and complained of pain in the lower back, right gluteus, and right hip after he tripped and fell. (Doc. 7-9, p. 71). Mr. Benson stated that his symptoms were of "moderate intensity." (Doc. 7-9, p. 71). Mr. Benson was positive for extremity pain, back pain, joint pain, and myalgias. (Doc. 7-9, p. 71). Mr. Benson had severe tenderness to palpation in his mid-lumbar area. (Doc. 7-9, p. 72). Mr. Benson had mild tenderness to palpitation in the hip, but his range of motion was normal. (Doc. 7-9, p. 72). A lumbar spine x-ray showed no acute fracture. Dr. Stringfellow diagnosed Mr. Benson with an acute lumbar strain and prescribed pain medication. (Doc. 7-9, p. 72).

On March 9, 2012, Mr. Benson saw Dr. Emanuel Joseph at Quality of Life and complained of worsening symptoms from his fall. (Doc. 7-10, p. 16). Mr. Benson described the pain as "an ache, burning, deep, piercing, shooting, stabbing, and throbbing." (Doc. 7-10, p. 16). The symptoms were aggravated by resting, rolling over in bed, standing, twisting, and walking. (Doc. 7-10, p. 16). He could not lie on the affected side, and according to Mr. Benson, his back was acutely painful to the touch. (Doc. 7-10, p. 16). Dr. Joseph noted normal mobility and curvature in Mr. Benson's cervical and thoracic spine, but he found that Mr. Benson had antalgic gait on the right side, and Mr. Benson's lumbar spine had a muscle spasm and severe pain with motion. (Doc. 7-10, p. 17). Dr. Joseph

diagnosed acute lumbago and acute bursitis and prescribed pain medication. (Doc. 7-10, p. 17).

On March 23, 2012, Mr. Benson returned to Dr. Joseph at Quality of Life and complained that there was no improvement since his last visit and that the medication had no effect on his pain. (Doc. 7-10, p. 19). Mr. Benson stated that he experienced "sharp low back pain after sneezing" that radiated down his left thigh and leg. (Doc. 7-10, p. 19). Dr. Joseph noted that Mr. Benson was positive for back pain and that his lumbar spine was tender and had a significantly reduced range of motion. (Doc. 7-10, p. 20). Mr. Benson was negative for joint pain, joint swelling, muscle weakness, and neck pain. (Doc. 7-10, p. 20). Dr. Joseph noted normal mobility and curvature in Mr. Benson's cervical and thoracic spine. (Doc. 7-10, p. 20). Dr. Joseph commented that Mr. Benson had "antalgic gait, no weight bearing on right leg[, and] truncal tilt." (Doc. 7-10, p. 20). Dr. Joseph diagnosed chronic lumbago, chronic lumbar sprain or strain, and bursitis. (Doc. 7-10, p. 21). He scheduled an MRI of Mr. Benson's spine and refilled Mr. Benson's medication. (Doc. 7-10, p. 21).

On October 9, 2012, Mr. Benson saw Dr. Thomas at Quality of Life to follow up on his back and leg pain and arthalgias located in his wrist. (Doc. 7-12, p. 42). Mr. Benson was positive for decreased mobility, limping, and spasms but negative for joint instability, joint locking, joint tenderness, popping, and

weakness. (Doc. 7-12, p. 43). Mr. Benson had a mildly reduced range of motion in his left knee, but otherwise, he had a normal musculoskeletal examination, and he had no other joint problems. (Doc. 7-12, p. 45). Dr. Thomas noted that Mr. Benson's hyperlipidemia, hepatitis C, and osteoarthrosis had improved, and she prescribed medication to treat Mr. Benson's symptoms and encouraged him to exercise. (Doc. 7-12, pp. 45-46).

On November 9, 2012, Mr. Benson again visited Dr. Thomas at Quality of Life and complained of lower back and leg pain that radiated to the left ankle. (Doc. 7-12, p. 47). Mr. Benson described the pain as "diffuse and shooting." (Doc. 7-12, p. 47). Dr. Thomas stated that Mr. Benson's symptoms were relieved by heat. (Doc. 7-12, p. 47). He had no edema in his extremities, but his gait was compensated, and his lumbar spine had a muscle spasm and a mildly reduced range of motion. (Doc. 7-12, p. 50). Again, Dr. Thomas found that Mr. Benson's hyperlipidemia, hepatitis C, and osteoarthrosis had improved. (Doc. 7-12, p. 50). She prescribed medication and encouraged aerobic exercises. (Doc. 7-12, p. 50).

On January 3, 2013, Mr. Benson visited the Calhoun-Cleburne Mental Health Board. (Doc. 7-10, pp. 32-33). Dr. Maurice Jeter, Jr. performed a psychiatric evaluation of Mr. Benson. Dr. Jeter found that Mr. Benson was in no apparent distress, he maintained good eye contact, and he responded to questions appropriately. (Doc. 7-10, pp. 32-33). Dr. Jeter noted that Mr. Benson had

"psychomotor retardation" and a depressed mood; however, Mr. Benson's affect was congruent, his insight and judgment were good, and he expressed no suicidal/homicidal ideations or psychosis. (Doc. 7-10, p. 33). Dr. Jeter diagnosed Mr. Benson with mood disorder due to chronic pain. Dr. Jeter assessed a GAF score of 60. (Doc. 7-10, p. 33). Dr. Jeter's report concludes with the following recommendations:

> Patient appears to be depressed today. As well he is not sleeping well. There are significant financial stressors in his family. Will prescribe Celexa 20 mg a day and Trazodone 100mg 1/2 to 1 at night as needed for insomnia.
>
> Patient was counseled on risks and benefits of medications, expressed understanding and consented to treatment. A safety plan was reviewed.
>
> Patient is to follow up according to therapist recommendations.

(Doc. 7-10, p. 33)

During an individual therapy session with a Calhoun-Cleburne Mental Health Board therapist on January 4, 2013, Mr. Benson's cognition was appropriate to the situation, and his speech was appropriate. (Doc. 7-10, p. 36). Mr. Benson arrived in a "dysphoric mood" and reported "difficulty since his wife lost her job due to lack of work." (Doc. 7-10, p. 36). Mr. Benson reported that he had tried to keep himself "occupied" by "tak[ing] apart and pu[tting] together many things in the house." (Doc. 7-10, p. 36). The therapist noted that Mr. Benson still had trouble sleeping, but the therapist hoped that medication would help. (Doc. 7-

10, p. 36).   The therapist noted that Mr. Benson was "making progress" with respect to his mental health treatment goals and recommended that Mr. Benson continue his treatment plan.  (Doc. 7-10, pp. 36-37).[4]

On January 11, 2013, Mr. Benson saw Dr. Thomas at Quality of Life and complained of lower back pain radiating into his right foot.  (Doc. 7-12, p. 52). The treatment note contains no musculoskeletal examination findings.  (Doc. 7-12, pp. 52-54).   Dr. Thomas noted that Mr. Benson's lumbar strain and chronic lumbago were improved.  (Doc. 7-12, p. 54).   Dr. Thomas prescribed medication and recommended aerobic exercises.  (Doc. 7-12, p. 54).

On January 28, 2013, Mr. Benson returned to Dr. Thomas and complained of musculoskeletal pain and arthralgia in his knees.  (Doc. 7-12, p. 55).   Mr. Benson reported that his knee pain was aggravated by bending, lifting, and sitting. (Doc. 7-12, p. 55).   Symptoms included decreased mobility, limping, and spasms, and the pain was relieved by exercise.  (Doc. 7-12, p. 55).  Mr. Benson had no joint instability, locking, popping, weakness, or tenderness, and his gait was normal. (Doc. 7-12, pp. 56-57).   Mr. Benson's lumbar spine had a muscle spasm and a mildly reduced range of motion.  Otherwise, Mr. Benson's musculoskeletal exam was normal.  (Doc. 7-12, pp. 57-58).  Again, Dr. Thomas noted that Mr. Benson's

---

[4] The January 4, 2013 progress note states that Mr. Benson had another appointment scheduled for February 4, 2013; however, the next treatment note from Calhoun-Cleburne Mental Health Board is dated July 12, 2013.  (Doc. 7-10, pp. 34, 37).

conditions were improved, and she recommended aerobic exercises. (Doc. 7-12, pp. 58-59).

On February 27, 2013, Mr. Benson saw Dr. Thomas at Quality of Life and complained that he continued to have pain in his right leg and both knees and needed medicine refills. (Doc. 7-12, p. 60). Mr. Benson had moderate pain with motion of his lumbar spine. (Doc. 7-12, p. 62). Dr. Thomas noted there was no edema present. Mr. Benson was positive for decreased mobility, limping, and spasms, but he was negative for joint instability, locking, tenderness, popping, and weakness. (Doc. 7-12, pp. 61-62). Dr. Thomas explained that Mr. Benson's conditions were improved, and she prescribed medication and recommended aerobic exercises. (Doc. 7-12, p. 63).

On May 3, 2013, Mr. Benson visited the emergency room at Stringfellow Memorial Hospital and complained about back pain and a gout flare up. (Doc. 7-12, p. 7). Although Mr. Benson complained of pain in his right great toe, he could fully bear weight. (Doc. 7-12, p. 7). Mr. Benson stated that he was out of Indocin and Lortab. (Doc. 7-12, p. 7). During a back examination, Dr. Jeffrey Pierson noted that Mr. Benson experienced moderate pain in the lumbar area, and his range of motion was painful with all movement. (Doc. 7-12, p. 8). Straight leg raises in both lower extremities were not painful. (Doc. 7-12, p. 8). Dr. Pierson noted that Mr. Benson's extremities were normal except for pain and tenderness in his right

great toe. (Doc. 7-12, p. 8). X-rays of Mr. Benson's lumbar spine revealed "minimal anterior marginal osteophyte formation [] at several levels," but "no acute fracture or sublaxation." (Doc. 7-12, p. 17). Dr. Pierson diagnosed gout and acute low back pain and prescribed pain medication. (Doc. 7-12, pp. 14, 16).

On July 12, 2013, Mr. Benson saw Ms. Robin Jackson, a therapist at the Calhoun-Cleburne Mental Health Board. (Doc. 7-10, p. 34). According to Ms. Jackson, Mr. Benson had probable deficits in judgment and insight. (Doc. 7-10, p. 34). Ms. Jackson noted that Mr. Benson was making poor progress with his treatment plan for his mood disorder. (Doc. 7-10, p. 34). Mr. Benson reported continued depression and stated that he recently was in the hospital for bronchitis and chest pain due to stress. (Doc. 7-10, p. 34). Ms. Jackson challenged Mr. Benson to redirect thinking to a more positive area of his life and encouraged him to be more focused with respect to his weight loss and diet. (Doc. 7-10, pp. 34-35). In a mental health treatment plan dated July 12, 2013, Ms. Jackson identified Mr. Benson's clinical needs or significant issues as vocational, psychiatric, emotional/psychological, family/social support, thinking, and health/medical. (Doc. 7-10, p. 38). As part of his mental health treatment, Mr. Benson was to "identify at least three [] or four physical activities he is able to do 15 to 30 minutes, 3 to 5 times a week." (Doc. 7-10, p. 40). With respect to his long-term recovery, Mr. Benson wished to "go back to technical school and learn to work on

motorcycles." (Doc. 7-10, p. 38). He stated that he had lost approximately 100 pounds and wanted financial stability and "to be happy" with himself. (Doc. 7-10, p. 38).

On July 26, 2013, Mr. Benson saw Dr. Thomas at Quality of Life for sharp pain radiating from his knee to his right buttock. (Doc. 7-12, p. 69). Elevation and pain medication helped relieve the pain. (Doc. 7-12, p. 69). Mr. Benson had lumbar spasms and moderate pain with motion but no edema or varicosities, or joint problems. (Doc. 7-12, pp. 71-72). Mr. Benson was positive for nocturnal awakening, swelling, and decreased mobility. (Doc. 7-12, p. 70). Dr. Thomas made no diagnoses concerning Mr. Benson's musculoskeletal pain, and she explained that other conditions had improved. (Doc. 7-12, p. 72). Dr. Thomas prescribed medication and recommended exercise. (Doc. 7-12, p. 73).

On August 2, 2013, Mr. Benson saw Dr. Thomas at Quality of Life and complained of back and knee pain. (Doc. 7-12, p. 74). According to Mr. Thomas, his pain was "aggravated by descending stairs, movement[,] and standing." (Doc. 7-12, p. 74). Mr. Benson was positive for joint pain, swelling, and difficulty initiating sleep. (Doc. 7-12, p. 75). He had no edema or varicosities. A musculoskeletal exam revealed normal range of motion and muscle strength and stability in all extremities with no pain on inspection. (Doc. 7-12, p. 77). Once

again, Dr. Thomas proscribed medications and recommended aerobic exercises. (Doc. 7-12, pp. 77-78).

### 2. Medical Opinions

On March 21, 2012, Dr. Anthony Fava performed a consultative examination of Mr. Benson. (Doc. 7-9, p. 80). Dr. Fava noted Mr. Benson's complaints of degenerative disc disease affecting the lumbar spine, chronic lower back pain, severe varicose veins in both legs causing chronic edema, and pain and swelling in the back and legs from standing more than one hour. (Doc. 7-9, p. 80). Dr. Fava stated that Mr. Benson's past medical history included gout for which Mr. Benson was not receiving treatment, Hepatitis C, and a history of urolithiasis. (Doc. 7-9, p. 80). According to Dr. Fava's notes, Mr. Benson carried a walking cane. (Doc. 7-9, p. 81). A neck examination revealed "no spams, thyromegaly, JVD, or bruits." (Doc. 7-9, p. 81). Mr. Benson's upper extremity examination was normal. (Doc. 7-9, p. 81). A lower extremity examination revealed "no cyanosis or clubbing," but "edema 3+" was present "with stasis changes of brown discoloration of both feet and lower legs." (Doc. 7-9, p. 81). In addition, Mr. Benson's pedal pushes were diminished. (Doc. 7-9, p. 81). Mr. Benson's back had no spasm or deformity. (Doc. 7-9, p. 81). Dr. Fava found that Mr. Benson had somewhat decreased range of motion in his neck, lower extremities, and back. (Doc. 7-9, pp. 83-84). Dr. Fava stated that Mr. Benson got "on and off [the]

examination table with moderate difficulty" and had a "labored gait."  (Doc. 7-9, p. 81).  Dr. Fava found no evidence of "ataxia or spasticity," but Mr. Benson could not "squat and arise" or "heel or toe walk."  (Doc. 7-9, p. 81).  Mr. Benson had positive seated straight leg raising on the right at 30 degrees and on the left at 45 degrees.  (Doc. 7-9, p. 81).  Mr. Benson's "fine and gross manipulation" were intact.  (Doc. 7-9, p. 81).

Dr. Fava reviewed a "normal" x-ray of Mr. Benson's lumbar spine which revealed that the osseous structures were intact, joint distance was normal, bone density was normal, and no evidence of soft tissue injury or dislocation.  (Doc. 7-9, p. 82).  Dr. Fava diagnosed Mr. Benson with degenerative disc disease of the lumbar spine, chronic low back pain, and extensive varicosities of the lower extremities.  (Doc. 7-9, p. 82).    According to Dr. Fava, Mr. Benson "can perform the following work-related activities:  sitting, standing, and walking for less than 1 hour; lifting, carrying, handling objects weighing less than 3 pounds; hearing and speaking.  He is unable to travel."  (Doc. 7-9, p. 82).

State Agency Medical Consultant Dr. Van B. Hayne, Jr. reviewed the medical evidence, including Dr. Fava's examination notes, and completed a medical consultation on April 6, 2012 regarding Mr. Benson's physical rating case needs. (Doc. 7-4, p. 8).  Dr. Hayne explained that based on the normal lumbar spine x-ray that Dr. Fava observed and a previous x-ray showing "some mild

multi-level DDD," the agency should request clarification from Dr. Fava regarding his examination. (Doc. 7-4, p. 8). Dr. Hayne also noted that Mr. Benson's treating physician ordered an MRI on March 23, 2012. (Doc. 7-4, p. 8). Dr. Hayne suggested that the agency review the MRI results and return appointment treatment notes. (Doc. 7-4, p. 8).[5]

Dr. Hayne's medical consultation prompted the agency to send Dr. Fava a letter requesting clarification of his examination of Mr. Benson. (Doc. 7-3, p. 54; Doc. 7-10, p. 29). In response to the request, Dr. Fava submitted a letter dated April 27, 2012. (Doc. 7-10, p. 28). The letter states:

> In response to Item A, recumbent straight leg raising is positive on the right at 40 degrees and positive on the left at 45 degrees.
>
> In response to Item B, there was 3+ pitting edema of the lower extremeties bilaterally; the edema extending from the ankles to the inferior border of the patella bilaterally; the edema in the most proximal point of the extremities measuring 1 to 2+ bilaterally.
>
> In response to Item C, the claimant was observed in his gait without a cane.
>
> In response to Item D, there was minimal skin breakdown bilaterally on the legs and feet.
>
> In response to Item E, the claimant was fully cooperative and I feel exerted his best effort in performing the activities of the physical examination.

---

[5] The record does not contain an MRI dated after March 23, 2012. During Mr. Benson's administrative hearing, Mr. Benson's attorney stated that Mr. Benson's physicians would not order MRIs "because he can't afford them." (Doc. 7-3, p. 70).

(Doc. 7-10, p. 28).

On May 7, 2012, Dr. Hayne completed a physical residual functional capacity assessment. (Doc. 7-4, pp. 12-15). Based on his review of the medical evidence, Dr. Hayne opined that Mr. Benson can occasionally lift or carry up to 20 pounds; frequently lift or carry up to 10 pounds; stand or walk for 3 hours with normal breaks; and sit with normal breaks for more than 6 hours on a sustained basis in an 8-hour workday. (Doc. 7-4, p. 13). Dr. Hayne also concluded that Mr. Benson is limited in his ability to push and pull in both lower extremities. (Doc. 7-4, p. 13). Dr. Hayne opined that Mr. Benson can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and occasionally balance, stoop, kneel, crawl. (Doc. 7-4, p. 13). Dr. Hayne also opined that Mr. Benson should avoid concentrated exposure to extreme cold and vibration, and he should avoid all exposure to hazardous machinery and heights. (Doc. 7-4, p. 14).

On May 7, 2012, Dr. Robert Estock completed a psychiatric review. (Doc. 7-4, p. 11). Dr. Estock found that Mr. Benson has no mental medically determinable mental impairment. (Doc. 7-4, p. 11). Based on his review of the record, Dr. Estock noted that with respect to activities of daily living, when asked about handling stress or changes in his routine:

> [Mr. Benson] states he would rather not have changes in routine if
> they cause pain, and changes that do not cause pain is ok with him;
> handling stress comes from the constant pain he experiences. When he
> is in terrible pain, he can[']t handle unnecessary stressors, daily

stressors are fine as long as pain is not involved in it. When he is in pain, instructions have to be read to him over and over again.

. . . cooks, does h[ouse]h[old] chores, shops in stores once a month for several hours, no problems managing money; [t]alk on the phone daily, no reminders needed to go places or to take meds; can[']t concentrate due to pain, gets along well with authority figures.

(Doc. 7-4, p. 11)

On November 15, 2013, Dr. James Anderson completed a medical expert interrogatory. (Doc. 7-12, p. 87). Dr. Anderson noted that Mr. Benson has chronic lower back pain with minimal radiographic pathology, hypertension, chronic bilateral lower extremity pain, superficial varicosities, polyarthralgia (gout), morbid obesity, a positive marijuana test from April 2012, and an asymptomatic positive Hepatitis C antigen. (Doc. 7-12, p. 87). Dr. Anderson opined that none of these impairments meets a listed impairment. (Doc. 7-12, p. 87).

Dr. Anderson included in his interrogatory the following brief summary of Mr. Benson's complaints:

He has vascular damage. His veins are way too large. He uses a cane. He has constant pain in feet, lower legs, back, and elsewhere at times with swelling particularly of the legs. Pain is never less than a 6 and at its greatest it is a 9 on a 10 scale. Can sit for 25 minutes at a time and stand for 30-45 minutes at a time and walk slowly for 20-30 minutes at a time. All told he can sit, stand and walk in combination for 3-4 hours a day but then must recline with his legs elevated. Cannot lift over 5 pounds without severe pain. Wife has to help him out of the shower. Takes a blood thinner. Medications cause him to be irritable and can't sleep at night.

(Doc. 7-12, p. 88). According to Dr. Anderson, the medical evidence supports some, but not all, of Mr. Benson's complaints. (Doc. 7-12, pp. 88-89). Dr. Anderson stated that the evidence supports some level of back and extremity pain. (Doc. 7-12, p. 89). Dr. Anderson opined that Mr. Benson can perform light work with a sit/stand option and that sedentary work also would be appropriate, based on the objective medical evidence. (Doc. 7-12, p. 89).

### 3. Mr. Benson's Functions Report and Testimony

In a functions report that he completed on February 5, 2012, Mr. Benson checked a box stating that he lives alone, and he reported no problems with personal care. (Doc. 7-7, pp. 30-31).[6] Mr. Benson does household chores like laundry and dishes. (Doc. 7-7, pp. 31-32). He runs errands, shops, and goes outside. (Doc. 7-7, p. 33). He rides in a car but does not drive because he has no license. (Doc. 7-7, p. 33). He can handle money, prepare meals, watch television, read, and talk on the phone. (Doc. 7-7, pp. 32-34). Mr. Benson does not do yard work because he cannot stand for long periods of time. (Doc. 7-7, p. 33). He also reports limitations in lifting, squatting, bending, standing, reaching, walking,

---

[6] Although Mr. Benson's function report suggests that he lives alone, according to his hearing testimony and medical evidence, Mr. Benson lives with his wife. (*See* Doc. 7-3, p. 72; Doc. 7-12, p. 88). Mr. Benson's function report also contradicts Dr. Anderson's report because Mr. Benson indicated that he has no problems with self-care, but Dr. Anderson stated that Mr. Benson's wife must help Mr. Benson out of the shower. *See* p. 22, above. During the administrative hearing, Mr. Benson testified that he needs help wiping after using the restroom and assistance showering and tying his shoes. (Doc. 7-3, pp. 90-91). Based on Dr. Anderson's report and Mr. Benson's hearing testimony, it is likely that Mr. Benson checked both boxes on the functions report in error.

sitting, kneeling, stair climbing, completing tasks, and concentration. (Doc. 7-7, p. 35). Mr. Benson reports that he "poorly" handles stress or changes in routine. He gets along well with authority figures and follows spoken instructions "fairly well," but he must re-read written instructions. (Doc. 7-7, pp. 35-36).

During his administrative hearing on August 14, 2013, Mr. Benson testified that he stopped working in 2009 because of back pain. (Doc. 7-3, p. 80). He stated that his legs swell after 60 to 90 minutes, that he has a lot of vascular damage in his legs, and that he has nerve pain in his lower back. (Doc. 7-3, pp. 73-74). He also reported that he has nerve pain in his right leg, high blood pressure, and depression. (Doc. 7-3, p. 73). Mr. Benson testified that his swelling, deformity, and daily pain are relieved only by elevating his legs. (Doc. 7-3, pp. 75-76). Because of this condition, Mr. Benson asserts that he can sit for only 20-30 minutes at a time, stand 30-45 minutes at a time, walk 20-30 minutes at a time, and alternate between sitting and standing 3 to 4 hours out of the day. (Doc. 7-3, pp. 76-77). His pain is never less than a 5-6 on a scale from 1-10. (Doc. 7-3, p. 78). He takes blood thinner and pain medication. (Doc. 7-3, pp. 79-80). Mr. Benson claims he could not afford surgery in 2006 to treat large veins in his legs, and he testified that his condition has gotten worse since March 2006. (Doc. 7-3, p. 75).

Mr. Benson has received treatment in the ER for chest pain due to stress, received a diagnosis of angina, and takes nitroglycerin. (Doc. 7-3, pp. 82-83). He reports hypertension with daily light-headedness and dizziness. (Doc. 7-3, p. 86). He takes Celexa and Trazadone to treat his depression and anxiety. (Doc. 7-3, p. 87). Mr. Benson has sexual and social side effects of depression and testified that he experiences anxiety attacks. (Doc. 7-3, p. 88-90). According to Mr. Benson, the Celexa makes him feel dizzy and light-headed when he is exposed to heat, causes impotence, and causes concentration and memory problems. (Doc. 7-3, p. 89). Mr. Benson has trouble sleeping, and he experiences anger and mood swings. (Doc. 7-3, p. 91).

### B. New Medical Evidence Mr. Benson Submitted to the Appeals Council

Mr. Benson submitted additional evidence to the Appeals Council. Included in this submission are treatment notes from visits to Quality of Life on April 6, 2012; April 20, 2012; May 7, 2012; June 25, 2012; July 25, 2012; August 31, 2012; October 2, 2012; September 18, 2013; December 18, 2013; April 2, 2014; and August 19, 2014. During these visits, Mr. Benson sought treatment for his back pain, chronic lumbago, leg pain, gout, hypertension, and medicine refills. (Doc. 7-14, pp. 2-58). These records largely are duplicative of the Quality of Life treatment notes that the ALJ reviewed.

Mr. Benson submitted records from an August 14, 2014 to August 18, 2014 admission to Gadsden Regional Hospital.  (Doc. 7-13, pp. 36-72).[7]  Mr. Benson complained that his Celexa was no longer working, and he was having suicidal thoughts and feelings of low self-esteem and hopelessness.  (Doc. 7-13, p. 36). Doctors noted that Mr. Benson experienced some non-prominent psychomotor retardation, depression, and suicidal ideation without plan or intent.  (Doc. 7-13, p. 37).  His mood was depressed, and his affect was restricted.  Mr. Benson's thought processing was linear and logical, and he showed no evidence of a thought disorder.  His concentration was fair, his memory and judgment were intact, and his insight was good.  (Doc. 7-13, p. 37).  Upon admission, Mr. Benson was diagnosed with severe and recurrent major depressive disorder without psychosis, moderate psychosocial stressors, chronic pain of the lower extremities due to inadequate venous flow, constant knee pain, arthritis, history of elevated cholesterol, elevated triglycerides, and a GAF of 35.  (Doc. 7-13, p. 37).  At discharge from the psychiatric unit, Mr. Benson's diagnoses remained unchanged except his GAF improved from 35 to 55.  (Doc. 7-13, p. 55).  Mr. Benson stated that he was feeling "a whole lot better," his mood was an 8-9 out of 10, he was

---

[7] Mr. Benson also submitted other medical records from Gadsden Regional Hospital (Doc. 7-13, pp. 1-35), but Mr. Benson does not argue that these records provide a basis for remand.  (*See* Doc. 10, pp. 43-46; Doc. 12, pp. 12-14).

sleeping well, and his medications were working. (Doc. 7-13, p. 54). The doctors described Mr. Benson's condition as "much improved." (Doc. 7-13, p. 55).

Mr. Benson also submitted a mental health source statement from Alisha Murphy, MS dated November 20, 2014. (Doc. 7-14, p. 62). Ms. Murphy opined that Mr. Benson can remember, understand, and carry out very short and simple instructions; sustain an ordinary routine without special supervision; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness. (Doc. 7-14, p. 62). Ms. Murphy found that Mr. Benson cannot maintain attention, concentration, and pace for periods of at least two hours or perform activities within a schedule, maintain regular attendance, or be punctual within customary tolerances. She also stated that Mr. Benson would miss two to five days of work in a 30 day period. (Doc. 7-14, p. 62). Ms. Murphy stated that Mr. Benson's limitations have existed since June 15, 2009. (Doc. 7-14, p. 62).

Finally, Mr. Benson submitted an initial psychiatric evaluation that Dr. Elizabeth Lachman completed on February 9, 2015. (Doc. 7-14, p. 63). During the examination, Mr. Benson complained that he "started thinking about it, but [he is] not suicidal." (Doc. 7-14, p. 63). Dr. Lachman noted Mr. Benson's history of depression and anxiety. (Doc. 7-14, p. 63). Dr. Lachman stated that Mr. Benson was ambulating with a walking cane and had a limited range of motion due to pain.

(Doc. 7-14, p. 63). With respect to Mr. Benson's mood and behavior, Dr. Lachman explained: "1. More bad than good, sleeping a bit better, since meds were change in hospital that helped[.] 2. Not sleeping well[.] 3. Cannot shut his mind off." (Doc. 7-14, p. 63). Dr. Lachman stated that Mr. Benson had fairly good physical health, good communication skills, good employment history, and a good primary support system, but he was unemployed due to his physical issues and had multiple biopsychosocial stressors. (Doc. 7-14, p. 65).

The Appeals Council reviewed this evidence but found that the records did "not provide a basis for changing the Administrative Law Judge's decision." (Doc. 7-3, pp. 2, 3, 7-8).

## V. ANALYSIS

Mr. Benson argues that he is entitled to relief from the ALJ's decision because the ALJ did not properly evaluate the opinion evidence in the record, did not properly evaluate Mr. Benson's subjective complaints of pain, and did not properly assess the testimony of the vocational expert. Mr. Benson also argues that remand is warranted based on the supplemental records that he submitted to the Appeals Council. The Court reviews each argument in turn.

### A. The ALJ accorded proper weight to the opinion of Dr. Fava, the consultative examining physician.

Mr. Benson argues the ALJ erred in assigning little weight to the opinion of consultative examining physician Dr. Fava and assigning greater weight to the

opinions of non-examining physicians Dr. Estock, Dr. Hayne, and Dr. Anderson. The Court disagrees.

An ALJ owes no deference to the opinion of a one-time examining physician like Dr. Fava. *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987) (citing *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir. 1986)); *see also Eyre v. Comm'r, Soc. Sec. Admin.*, 586 Fed. Appx. 521, 523 (11th Cir. 2014) ("The ALJ owes no deference to the opinion of a physician who conducted a single examination: as such a physician is not a treating physician."). In addition, an ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *McCloud v. Barnhart*, 166 Fed. Appx. 410, 418-19 (11th Cir. 2006).

The ALJ gave little weight to Dr. Fava's opinions regarding Mr. Benson's limitations. The ALJ explained:

> His opinions are obviously based almost totally on subjective report by the claimant, are not at all supported by his own clinical examinations and testing, as discussed above, and are totally inconsistent with all of the objective medical evidence and the record as a whole.

(Doc. 7-3, p. 54). The ALJ did not err in assigning little weight to Dr. Fava's medical opinion because the objective medical evidence and the other medical opinions support a contrary conclusion.

There is nothing in the objective medical evidence to support Dr. Fava's opinion that Mr. Benson can lift less than three pounds or his opinion that Mr.

Benson can sit, stand, or walk for less than one hour. Dr. Fava's examination revealed that range of motion was normal in Mr. Benson's knees and ankles. (Doc. 7-9, p. 84). With the exception of flexion in Mr. Benson's dorsolumbar spine, Mr. Benson's range of motion in his back was only moderately restricted. (Doc. 7-9, p. 83). Dr. Fava reviewed a "normal" x-ray of Mr. Benson's lumbar spine. (Doc. 7-9, p. 82). No treating physician limited Mr. Benson's activity, and his primary care doctors regularly encouraged Mr. Benson to exercise. In addition, Mr. Benson's treating physicians found severely reduced range of motion during just one visit on March 23, 2012; findings during other examinations revealed normal movement or mild to moderate restrictions in movement. (*See e.g.*, Doc. 7-9, p. 72; Doc. 7-10, pp. 10, 20; Doc. 7-12, pp. 45, 50, 57-58). Accordingly, under the governing legal standard, substantial evidence supports the ALJ's decision to give little weight to Dr. Fava's opinion. *See McCloud*, 166 Fed. Appx. at 418-19.

In support of his argument that the ALJ gave too little weight to Dr. Fava's opinion, Mr. Benson cites *Wilder v. Chater*, 64 F.3d 335 (7th Cir. 1995). Procedurally, the Seventh Circuit Court of Appeals's decision in *Wilder* is not binding in this circuit. Substantively, *Wilder* is distinguishable from Mr. Benson's case. In *Wilder*, the Seventh Circuit found that the ALJ rejected "the only medical evidence in the case" concerning the claimant's depression. *Wilder*, 64 F.3d at 337. Here, Dr. Fava's opinion is not the only evidence in the record concerning

Mr. Benson's impairments.  The ALJ properly considered the medical evidence as a whole, including all of the medical opinions in the record, in reaching his decision.  *See* 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive.").

With the exception of Dr. Fava, the other physicians who submitted medical opinions in this case are nonexamining, reviewing physicians.  The "opinions of nonexamining, reviewing physicians, when contrary to the opinion of a treating physician, are entitled to little weight and do not, 'taken alone, constitute substantial evidence.'"  *Gray v. Comm'r of Soc. Sec.*, 550 Fed. Appx. 850, 854 (11th Cir. 2013) (per curiam) (citing *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985)).   Nevertheless, if an ALJ properly discounts a treating physician's opinion, then the ALJ may rely on contrary opinions of non-examining physicians.  *See  Wainwright v. Comm'r of Soc. Sec.*, 2007 WL 708971, at *2 (11th Cir. Mar. 9, 2007) (per curiam) (holding that the ALJ properly assigned substantial weight to non-examining sources when he rejected a treating psychologist's opinion and stated proper reasons for doing so); *Ogranaja v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 848, 850-51 (11th Cir. 2006) (per curiam) (noting that an ALJ may consider reports and assessments of state agency physicians as expert opinions and finding that the ALJ's decision was supported by substantial evidence because the

ALJ "arrived at his decision after considering the record in its entirety and did not rely solely on the opinion of the state agency physicians.").[8]

With respect to Dr. Estock's opinion, the ALJ explained that Dr. Estock provided "specific reasons . . . grounded in the evidence of record" for his opinion that Mr. Benson is not disabled. (Doc. 7-3, p. 47). The ALJ noted, however, that medical evidence from Dr. Maurice Jeter that Mr. Benson submitted after Dr. Estock completed his review confirmed a diagnosis of depression/mood disorder. (Doc. 7-3, p. 47; *see* Doc. 7-10, p. 33). The ALJ specifically accounted for this diagnosis and adjusted Mr. Benson's RFC accordingly but concluded that this impairment does not preclude work. (Doc. 7-3, pp. 47-49). The ALJ gave "great weight" to Dr. Anderson's opinion because "it is consistent with records and reports obtained from [Mr. Benson's] treating physicians and with the evidence as a whole." (Doc. 7-3, p. 53). The ALJ gave Dr. Hayne's opinions "substantial weight" because his opinions "are consistent with the overall record" and with Mr. Benson's RFC. (Doc. 7-3, p. 53).

The ALJ's reasons for assigning greater weight to the opinions of the non-examining physicians are "explicit, adequate, and supported by substantial evidence in the record." *Wainwright*, 2007 WL 708971, at *2 (substantial

---

[8] The Court notes that the medical records before the ALJ in Mr. Benson's case contained no medical opinion regarding disabling impairments from a treating physician and no physical or mental capacities assessment from a treating physician.

evidence supported ALJ's decision to accept opinion of state agency psychologist where the ALJ stated with particularity the reasons for doing so); *see also Osborn v. Barnhart*, 194 Fed. Appx. 654, 668 (11th Cir. 2006) (substantial evidence supported ALJ's decision to credit state agency physician's evaluation over other medical opinions where the claimant failed to produce evidence from a medical source indicating the limitations his impairments had on his ability to work and where the state agency evaluation was supported by other objective evidence). Therefore, the ALJ properly evaluated the medical opinion evidence.

### B. The ALJ properly examined Mr. Benson's subjective complaints of pain.

"To establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'" *Zuba-Ingram v. Comm'r of Social Sec.*, 600 Fed. Appx. 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)). A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citation omitted). If the ALJ discredits a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing

so." *Wilson*, 284 F.3d at 1225; *see* SSR 16-3P, 2016 WL 1119029 at *9 ("The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.").[9] In evaluating a claimant's subjective testimony, an ALJ may consider objective medical evidence and information from the claimant and treating or examining physicians, as well as other factors such as evidence of daily activities, the frequency and intensity of pain, any precipitating and aggravating factors, medication taken and any resulting side effects, and other measures taken to alleviate the claimant's pain or other symptoms. *See* 20 C.F.R. §§ 404.1529(c)(2)(3), 416.929(c)(2)(3).

The ALJ accurately summarized Mr. Benson's testimony and found that Mr. Benson's medically determinable impairments could reasonably be expected to

---

[9]On March 28, 2016, SSR 16-3p superseded SSR 96-7p (the ruling concerning subjective complaints of pain that was in effect when the ALJ issued a decision in this case) and "provides guidance about how [the Social Security Administration] evaluate[s] statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims." SSR 16-3p, 2016 WL 1119029, at * 1; *see* 2016 WL 1237954, at *1. SSR 16-3p eliminates the term "credibility" from social security policy but does not change the regulations that set forth the factors that an ALJ should consider when examining subjective pain testimony. *See* 2016 WL 1119029, at *7. The Court is not persuaded by Mr. Benson's argument that SSR 16-3p applies retroactively. *See Green v. Comm'r of Soc. Sec.*, --- Fed. Appx. ----, 2017 WL 3187048, at *4 (11th Cir. July 27, 2017) ("Administrative rules are not generally applied retroactively. . . . Because SSR 16-3p does not specify that it applies retroactively, and [the claimant] has not provided any authority showing that it applies retroactively, we decline to apply that standard here.") (internal citation omitted).

cause the pain he described, but his "statements concerning the intensity, persistence, and limiting effects of these symptoms" are not credible. (Doc. 7-3, p. 51).[10] The ALJ found that Mr. Benson's testimony is inconsistent with the objective medical examination findings, radiological testing that revealed no "marked spinal stenosis, nerve root compression, ruptured disc, herniated disc, or other serious nerve root pathology," Mr. Benson's conservative treatment, and Mr. Benson's activities of daily living. (Doc. 7-3, p. 49). The ALJ cited specific reasons, supported by the record, for rejecting Mr. Benson's testimony. Therefore, substantial evidence supports the ALJ's examination of Mr. Benson's subjective complaints of pain. *See Brown v. Comm'r of Soc. Sec.*, 442 Fed. Appx. 507 (11th Cir. 2011) (the ALJ sufficiently assessed the credibility of the claimant's testimony where the ALJ thoroughly discussed the claimant's allegations in light of the record as a whole); *Hennes v. Comm'r of Soc. Sec.*, 130 Fed. Appx. 343, 347-49 (11th Cir. 2005) (ALJ properly rejected claimant's subjective testimony because the testimony was not supported by clinical or laboratory findings and because the testimony was inconsistent with other medical evidence and the claimant's daily activities).

---

[10] The ALJ did not err in using the term "credible." SSR 16-3p does not apply to Mr. Benson's case because the Commissioner issued his decision before SSR 16-3p became effective. *See supra* note 9.

Mr. Benson argues that the ALJ improperly drew adverse inferences from his lack of medical treatment and did not properly consider that he could not afford treatment. (Doc. 10, pp. 39-41). The Eleventh Circuit has recognized that "if one's disability could be cured by certain treatment, yet treatment is not financially available, then a condition which is disabling in fact continues to be disabling in law." *Belle v. Barnhart*, 129 Fed. Appx. 558, 560 n. 1 (11th Cir. 2005) (citing *Dawkins v. Bowen*, 848 F.2d 1211, 1213 (11th Cir. 1988)). The ALJ acknowledged Mr. Benson's testimony that he could not afford an MRI or surgery that Mr. Benson states his doctor recommended in 2006 to treat varicose veins. (Doc. 7-3, pp. 49, 75). Mr. Benson did not provide testimony or evidence that he was unable to afford other treatment. The ALJ explained that Mr. Benson's medical records demonstrate that:

> [n]o physician has recommended or agreed to perform surgery for any impairment found. Nor has the claimant undergone extensive treatment of the kind customarily given for intractable pain such as epidural injections, a spinal cord stimulator implant or a TENS unit. The claimant does not participate in physical or other rehabilitative services for pain, has not been referred for pain management evaluation and has not been prescribed extensive narcotic or intramuscular or intravenous medications for pain.

(Doc. 7-3, p. 50).[11]

---

[11] With respect to the ALJ's finding that no physician recommended surgery, the Court notes that during a January 7, 2010 visit at Alexandria Medical Clinic, Mr. Benson asked his physician for a referral to a vascular doctor. (Doc. 7-9, p. 23). The treatment note states that Mr. Benson's physician provided a "vascular surg[ery] referral." (Doc. 7-9, p. 23). The treatment note also indicates that Mr. Benson did not keep a vascular surgery consultation appointment on December

Even if Mr. Benson were unable to afford surgery or an MRI, the ALJ did not solely rely on Mr. Benson's choice of treatment in evaluating Mr. Benson's subjective complaints. The ALJ considered the record as a whole, including generally benign examination and diagnostic findings, the medical opinion evidence, and Mr. Benson's daily activities. Therefore, Mr. Benson has not shown reversible error. *Compare Ellison v. Barnhart*, 355 F.3d 1272, 1275 (11th Cir. 2003) ("[W]hen an ALJ relies on noncompliance as the sole ground for the denial of disability benefits, and the record contains evidence showing that the claimant is financially unable to comply with prescribed treatment, the ALJ is required to determine whether the claimant was able to afford the prescribed treatment."), *and Green v. Comm'r of Soc. Sec.*, --- Fed. Appx. ----, 2017 WL 3187048, at *4 (11th Cir. July 27, 2017) (if an ALJ's disability determination is not based solely on noncompliance but "also is based on other factors, such as RFC, age, educational background, work experience, or ability to work despite the alleged disability, then no reversible error exists.").

Mr. Benson also argues that the ALJ improperly relied on his daily activities. (Doc. 10, pp. 37-39). The Eleventh Circuit has noted that "participation in everyday activities of short duration" does not necessarily disqualify a claimant from disability. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). But the

---

30, 2009. (Doc. 7-9, p. 23). The Court has not located a medical record from a vascular surgeon or another provider recommending surgery.

regulations expressly permit an ALJ to consider a claimant's activities of daily living when assessing a claimant's subjective complaints of pain. *See* 20 C.F.R. §§ 404.1529(c)(2)(3), 416.929(c)(2)(3). Here, the ALJ properly examined Mr. Benson's daily activities as part of his analysis. For example, the ALJ considered information that Mr. Benson provided in his function report indicating that Mr. Benson does some household chores, runs errands, shops, prepares meals, watches television, reads, and talks on the phone. (Doc. 7-3, p. 49). The ALJ also considered Mr. Benson's testimony that he has a difficult time showering on his own or engaging in activities that require lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and stair climbing. (Doc. 7-3, p. 49). The ALJ acknowledged that Mr. Benson's activities are "fairly limited" but found that the reported limitations are not consistent with "relatively weak medical evidence and other factors discussed in this decision." (Doc. 7-3, p. 49).

Accordingly, the ALJ properly examined Mr. Benson's activities of daily living, and substantial evidence supports the ALJ's findings with respect to Mr. Benson's subjective complaints. *See Dyer v. Barnhart*, 395 F.3d 1206, 1212 (11th Cir. 2005) ("In sum, the ALJ considered [the claimant's] activities of daily living, the frequency of his symptoms, and the types and dosages of his medications, and concluded that [the claimant's] subjective complaints were inconsistent with his testimony and the medical record. The ALJ thus adequately explained his reasons

and it was reversible error for the district court to hold otherwise."); *Carman v. Astrue*, 352 Fed. Appx. 406, 408 (11th Cir. 2009) ("The ALJ articulated various inconsistencies in [the claimant's] evidence that a reasonable person could conclude supported the ALJ's finding that [the claimant's] subjective complaints of pain were not entirely credible.").

## C. The ALJ properly evaluated the vocational expert's testimony.

Mr. Benson argues that the ALJ's decision is not based on substantial evidence because the ALJ relied on the vocational expert's answer to a hypothetical question that did not include all of Mr. Benson's alleged limitations or impairments. (Doc. 10, p. 41). For the testimony of the vocational expert "to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Jones v. Apfel*, 190 F. 3d 1224, 1229 (11th Cir. 1999). However, "an ALJ is 'not required to include findings in the hypothetical that the ALJ had properly rejected as unsupported.'" *Pinion v. Comm'r of Soc. Sec.*, 522 Fed. Appx. 580, 582 (11th Cir. 2013) (quoting *Crawford*, F. 3d at 1161). Mr. Benson contends that the ALJ erred in rejecting the VE's testimony in response to a hypothetical question that incorporated the limitations that Dr. Fava identified. (Doc. 10, pp. 42-43). Because substantial evidence supports the ALJ's decision to give little weight to Dr. Fava's opinion, *see* pp. 29-33, *supra*, the ALJ was not required to accept the vocational expert's testimony

based on Dr. Fava's opinion. *See Pinion*, 522 Fed. Appx. at 583 (the ALJ "properly disregarded" the vocational expert's testimony based on a medical opinion that "was not bolstered by the evidence").

> ### D. The evidence that Mr. Benson submitted to the Appeals Council does not warrant remand.

"'With a few exceptions, [a] claimant is allowed to present new evidence at each stage of the administrative process,' including before the Appeals Council." *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1320 (11th Cir. 2015) (quoting *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1261 (11th Cir. 2007)). The Appeals Council must review evidence that is new, material, and chronologically relevant. *Ingram*, 496 F.3d at 1261. The Court considers de novo whether supplemental evidence is new, material, and chronologically relevant. *Washington*, 806 F.3d at 1321.

For supplemental evidence to be material, the evidence must be "relevant and probative so that there is a reasonable possibility that it would change the administrative result." *Hyde v. Bowen*, 823 F.2d 456, 459 (11th Cir. 1987). For example, if the claimant's assertion of a particular ailment is unsubstantiated, supplemental medical evidence with respect to that ailment is material because there is a reasonable possibility that the ALJ may have decided differently if the claimant's assertion had been validated by medical evidence. *Caulder v. Brown*, 791 F.2d 872, 878 (11th Cir. 1986).

Assuming that the evidence that Mr. Benson submitted to the Appeals Council is new and chronologically relevant, the evidence does not require remand because the evidence is not material. That is, there is no reasonable possibility that the evidence would change the administrative result.

The additional Quality of Life treatment notes are nearly identical to those that the ALJ reviewed. Mr. Benson complained of leg and back pain, and doctors found normal to moderately restricted range of motion in Mr. Benson's lumbar spine. (Doc. 7-14, pp. 2, 4, 6, 8, 10, 12, 14, 16, 18, 24, 26, 29, 35, 40, 46, 51). Mr. Benson's doctors encouraged exercise and on a number of occasions noted that Mr. Benson's back pain and osteoarthrosis were improved. (Doc. 7-14, pp. 4, 9, 13, 16-17, 20, 25, 29-30, 36-37). These notes do not contain a statement from a physician restricting Mr. Benson's activities or explaining that he is unable to work. *See McCruter v. Bowen*, 791 F.2d 1544, 1547 (11th Cir. 1986) ("[T]he 'severity' of a medically ascertained disability must be measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality").

The additional psychiatric evaluation from Gadsden Regional Hospital does not reveal anything more probative than the psychiatric evaluation already on record. Although Mr. Benson received four days of in-patient psychiatric treatment after experiencing suicidal thoughts, by discharge, Mr. Benson's

condition had improved. His affect was "much more reactive," and he was experiencing "[n]o suicidal or homicidal ideations." (Doc. 7-12, p. 96). At discharge, doctors diagnosed severe, recurrent major depressive order. (Doc. 7-12, p. 96). The ALJ included depression and mood disorder among Mr. Benson's severe impairments, and the ALJ accounted for these impairments in his RFC determination. (Doc. 7-3, p. 45; Doc. 7-3, pp. 48-50; Doc. 7-10, p. 33). In addition, although the treatment notes from Gadsden Regional Hospital contain mental health diagnoses, the notes contain no statements from a physician regarding accompanying limitations. Functional limitations accompanying clinical findings are necessary in determining disability. *See McCruter*, 791 F.2d at 1547; *see also* 20 C.F.R § 404.1521(a) ("An impairment or combination of impairments is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities.").

Dr. Lachman's psychological evaluation likewise does not suggest that Mr. Benson's mental impairments impact his ability to work. Dr. Lachman reviewed Mr. Benson's psychiatric history and assessed his "assets" and "weaknesses," but Dr. Lachman made no diagnoses, and she did not limit Mr. Benson's activities as a result of his mental or physical conditions. (Doc. 7-14, pp. 63-65).

Finally, the Mental Health Source Statement from Alisha Murphy, MS, is not probative of disability. Ms. Murphy circled answers on a pre-printed form, and

she did not provide clinical findings to support her conclusions. *See Spencer on Behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985) (explaining that an ALJ may appropriately afford little weight to a physician's opinion when the physician has "merely checked boxes on a form without explaining how he reached his conclusions"); *see also* 20 CFR 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the more weight we will give that medical opinion.").

In sum, the additional evidence that Mr. Benson submitted to the Appeals Council does not warrant remand because the evidence "does not change the conclusion that the denial of benefits [] was supported by substantial evidence." *McCants v. Comm'r of Soc. Sec.*, 605 Fed. Appx. 788, 791 (11th Cir. 2015).

## V. CONCLUSION

For the reasons discussed above, the Court finds that substantial evidence supports the ALJ's decision, and the ALJ applied proper legal standards. The Court will not reweigh the evidence or substitute its judgment for that of the Commissioner. Accordingly, the Court affirms the Commissioner. The Court will enter a separate final judgment consistent with this memorandum opinion.

**DONE** and **ORDERED** this September 22, 2017.

_Madeline H. Haikala_

**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE